Thank you and it is Beier, Dr. Beier. Thank you. The opening brief raises eight issues. There's eight issues in the reply and in the government's answer. Counsel, could I ask you to introduce yourself for the record? Oh, sorry about that, Your Honor. Steve Hornmail on behalf of Mr. Beier, Dr. Beier. Thank you. And I think that the two issues that I would like to address the most would be the issues relating to the mental issues that were raised before Judge Lodge post-conviction and prior to sentencing, and that's the competency to be sentenced and also the motion for new trial based on newly discovered evidence. The posture of the case is unique in that if the court finds that Judge Lodge should be reversed on competency, then that invokes the procedures in 4142 and seeing if he can be restored to competency. If the court finds him competent and affirms Judge Lodge on that basis, then the issue of new trial comes into play, which is a different analysis than it is for the competency determination. The difficulty in the posture of the case after I was brought on board is that Dr. Beier had gone to trial on a factual defense, basically saying, I didn't do it, and absolutely denying everything that the government produced and saying he absolutely didn't do anything, and that's pretty replete in the record, and that he was selling ginseng illegally and not selling pills, even though the evidence in the videotape absolutely shows or shows otherwise. So the issue really is, is there a mental defect, a significant mental defect or disease that is causing Dr. Beier to deny the obvious, as trial counsel said, or completely disregard the facts and claim that this is all a conspiracy, all a con, all a scam, that the evidence was tampered with and all that. How is this, counsel, how is this really any different than a situation where, and I've had these cases, where an individual is identified by three or four people who know him at the scene of a bank robbery, and his car is identified, and yet he claims that there was probably some kind of a doppelganger, and the car was just a mere coincidence, and it wasn't him, he was actually off on another, I'm from Hawaii, he was off on another island at the time, although he can't produce any evidence of that. Well, that person may have been needed to be evaluated. No, he didn't. He was just lying. What's that? Yeah, he was just lying. Well, that's interesting that you say that, because both Dr. Lowe and Dr. Adler, Dr. Lowe found that he was a credible historian, which is contrary to that. That sounds like that person's not a credible historian. Also, Dr. Adler. But you almost just admitted he's not a credible historian. He said he was selling ginseng when he was selling pills. Well, that's the point, is the PAI taken by Dr. Adler said, this is not conscious lying, this is an underlying mental issue and not some kind of fakery. That's the difference. I mean, I've represented many fraud people, you know, and I used to work for the Federal Defenders of Eastern Washington and Idaho for 16 years. I've represented a lot of fraud people, and I know the difference between a fraudster and someone like Dr. Byer. I've represented a gentleman before this court, actually, that thought he was a born-in-Nez Perce Indian. He was a citizen from Mexico. He had a delusional disorder. In my contact with Dr. Byer and the Mexican citizen who believed he was a Nez Perce Indian, who went to trial three times and nobody picked up on that, are exactly the same. If you walk in and talk to them on a blank, completely blank slate, without knowing anything about the case, they are highly believable. And the reason they're highly believable is because they're living in this delusion. And that's what Dr. So can you explain to me in your argument that you should have a new trial, what is new about this evidence? You need to show new evidence, and I don't understand how this is new evidence. The new evidence is the mental disease in effect. But didn't you have that evidence already? At trial, no. I wasn't the trial counsel. But there was a competency hearing. No, that was after the trial and after I was retained. The competency hearing did not occur before the trial. But it could have. I mean, when were the doctor's evaluations? I mean, the point is his mental state was what it was. So why wasn't he evaluated earlier? Because the trial counsel said he missed it. And the DSM-5 hits us right on the nose when it says people with high levels of functioning, intellectual functioning, are a lot more difficult to detect in any mental disorder or defect, especially when you're talking about neurocognitive disorder, because they do have a higher level of functioning. And they're hard to detect. And that was what was difficult, I believe, in Dr. Byer's case. And the only reason that I had any inkling that we may be dealing with a mental disease or defect was because I did have experience with someone else who had a delusional disorder. And in my opinion, Dr. Byer's symptoms, because when I meet with him, and when I met with him the first time, some of the things that he told me made perfect sense. But when I started investigating, it didn't. Were all of the evaluations after the trial? Yes, after the trial. All of the medical evaluations? All the medical evaluations. Everything occurred after trial. Oh, go ahead. Oh, go ahead, Judge. All right. Let me step you back a minute. You've said, oh, his counsel said he missed it, right? Yes. So you acknowledge that the evidence was there, or you're telling us the evidence was there, and his counsel missed it. Yeah, I would say. Well, if it wasn't there, then he couldn't have missed it, could he? Well, made a mistake is what he said. He may have made a mistake. Well, I don't know. What does that mean? But in any event, it sounds to me like if that is true, and this evidence was overlooked by the lawyer or whatever, assuming that it's even credible, then that's another issue, because we did have a hearing here. Judge Lodge did a hearing. We did. But that's another issue, which we'll get to. It sounds like a 2255 to me. I don't know. Well, we're at the point where there was a competency, a complete psychiatric competency evaluation prior to sentencing. We're in the same state that the Dreyer case was in, where this court reversed that. Well, yeah, but you're not just raising the sentencing. You're raising the conviction, aren't you? Well, and that's a – Who are you? Yes, I'm raising the conviction in the sense that on a factual defense, Dr. Byer is not capable of rationally understanding the factual proceedings against him because he has this delusional view that it's all a scam. So you're attacking the conviction. I am attacking the conviction. All right, so we're there. Okay. And you're attacking the conviction on the basis that the lawyer failed to pursue this mental health issue appropriately, right? If we get that far, if the court doesn't grant a new trial based on newly discovered evidence. I'm not seeing the newly discovered evidence. You just said that the doctor, I presume, said something and that the lawyer made a mistake and missed it. Maybe the focus is wrong, though. The newly discovered evidence has to be diligence that includes the defendant's input. Dr. Byer, as reported by all psychologists and psychiatrists in this case, is denying any kind of psychological reason. Okay, so we're going – The newly discovered evidence is the multiple head traumas that cause the traumatic brain injury. The dog is chasing his own tail here. Look, my understanding here is that he's maintaining that he didn't sell pills. He sold ginseng, right? Yes. Okay. Did he tell his lawyer that? I believe so. Okay, and his lawyer didn't raise that issue or take that issue and then turn it into what you believe is a viable mental health issue that should have gone to the very heart of whether he should have been prosecuted in the first place, right? Well, yes. That's a 2255. But the mental health issue, Your Honor, wasn't discovered. The basis of the mental health issues, the multiple blows to the head, the traumatic brain injury, the things that Dr. Byer – just like the Nagel case. In the Nagel case, the defendant didn't disclose that he had been in this car wreck. But isn't that the lawyer's fault? I mean, why didn't the lawyer – why isn't it an ineffective assistance of counsel argument for not investigating? Why is this guy delusional? Would the sons testify his personality changed after the car accident or the accident? I don't understand why it wasn't discoverable. All this evidence existed. Well, it was discovered. The conviction, based on a factual defense, is separate than the workup that was done after the conviction and before sentencing that did disclose these problems. But that's just like any other IAC claim where we learn later that there were things that the lawyer should have figured out earlier. Yes, but in competency proceedings, the competency can be raised at any stage after the conviction before sentencing. But there was a competency proceeding, and this gets to the other issue. And I think we have to review it for clear error. The judge said he's competent. Yes. What is your challenge to the competency hearing? After all, there was a full two days. Yes. And there were presentations going either way, including a neutral expert, which, as it turned out, I guess the judge believed. Where is the clear error in all of that? Well, I think the credibility determination in this case is a lot different than saying you lied and you didn't lie. That's not really what Judge Lodge did because Judge Lodge accepted the entire body of Dr. Adler's work, which means Dr. Adler's entire body of work was credible. So what he's saying is it appeared that Dr. Adler and Dr. Beaver were being more active helping the defense counsel prepare for examination of Dr. Lowe, and therefore I'm going to find that they're more defense-oriented. That's different than saying they're lying. They're just actively supporting their opinions and helping me. One of the issues that came up during the competency hearing, and I'm not an expert in the DSM-5, so I have to have an expert point me to things, is that Dr. Lowe was saying that he's not significantly impaired because there has to be a standard deviation of minus 2 below the mean in order to have somebody be significantly impaired, when in fact the DSM-5 for mild traumatic neurocognitive disorder requires findings between a negative 1 and a negative 2. So was that argued to the judge at the time? Yes, and that was brought up in cross-examination after my experts pointed me to the DSM-5, the part of the DSM-5 that showed that Dr. Lowe's testimony wasn't supported by the diagnostic tool that relates to this case, and I think that's what the problem is. So you want us to reverse unclear error based on a disagreement about what the DSM requires? Yeah, well, the DSM is the tool. But part of what the judge said is I've observed this guy and I think he's competent, so that really isn't about the DSM, is it? He didn't have the multiple meetings I had with Dr. Beyer to get a feeling for what this was all about. He did get to see Dr. Beyer in court and how he acted in court. He wasn't like Dr. Nagel in the Nagel case that was creating outbursts, but the DSM-5 said that's not characteristic of somebody who suffers from a neurocognitive brain disorder. I can cite the court to that. I think the DSM-5 is the tool that has to be followed in order to determine whether or not Dr. Adler and Dr. Beaver's testimony is credible and whether the entire evidence, all of the work done by Dr. Ziegler, Dr. Adler, Dr. Conner, the PET, the MRI, the quantitative analysis, all of that Judge Lodge found to be credible. Let me ask you, you're kind of repeating yourself, but let me ask you, counsel, wasn't there testimony besides Judge Lodge's observation through the whole trial? We also have, I believe, you correct me if I'm wrong, testimony from other doctors, or at least one if not more, who said that they had interacted with your client for all this period of time and he seemed perfectly rational and fine. Yes. Isn't that true? The DSM-5 indicates that the mild form of neurocognitive disorder, you can still function independently. It's part of the diagnosis of the DSM-5. Here you are parsing away the credibility determination because if you can have a mild form, right, that allows you to practice, allows you to interact, allows you to make rational decisions because that's what the colleagues say. He was dealing with them perfectly fine, never thought a thing of it, and why couldn't he have made the decision to, i.e., either conjure up, because this was the only defense he had, the ginseng defense. You know, he's telling people, oh, I was selling ginseng, you know, and I, whatever, which Judge Lodge didn't believe, or at least he didn't credit it. And his other symptoms, and then, of course, his family says in support of him, oh, yeah, he was dramatically different. But then you have disinterested individuals who say he wasn't dramatically different, he was the same. And I do have an answer to that. All right. I want to hear it. Dr. Beaver said that he's represented professionals, doctors who have suffered from similar conditions as Dr. Byer, and that through their training that they become able to do it. Like, if I became mentally disabled, I could probably still read a law book and argue. It's different than when you're functioning and your life and your personal life is changing because he's trained to react and to know certain things in certain conditions through his professional training. That doesn't mean he can't suffer from a mental disorder. In fact, the DSM-5 says that, that it's harder to detect in professionals who have intellectual higher functioning. I understand exactly what you're saying, but I think we're passing each other in the night here because what he was doing is akin to you doing things in your law practice. What you're telling us is that he can be a great doctor. He can do everything. But when it comes to prescribing medication, he all of a sudden thinks the medication is ginseng and not pills. Yes. Right? But everything else is okay. But the one fact I think... That would be like you as a lawyer. You can come and argue to the great judges of the Ninth Circuit and do well and do great. But the minute you walk out of the Ninth Circuit courtroom, you all of a sudden can't remember how to be a lawyer. I don't think that's what anybody is saying. But the one thing is the doctor that had personal contact with him, that ended in 2012. And I don't know because I didn't know this specific question was going to come up, but Dr. Panos did not work with Dr. Byer after 2012 or even 2011. I don't know. It's in the transcript. Dr. Panos testified to that at the competency hearing. So it's before all of the major manifestations of his conduct. Plus, he was violating his professional standards after hours by the conduct that he was engaged in. The issue is what's causing him to engage in this conduct and not realize that he's being morally wrong when he's doing it. The question for me isn't whether I, if I was the judge, I would. And I'm not saying I would by any means. But if I was a judge sitting where Judge Lodge did, and I used to sit in Idaho, so that I would reach a different conclusion. That's not the test. No, I understand. It's not a de novo review here. No, but the test is this. The test is whether or not this court is left with a definite and firm conviction the trial court made a mistake. So that's the test and clear, yes, it's in law form. Well, I know what the test is. Okay, okay. That's a very deferential test. Yeah, yeah, but what I'm trying to say, Your Honor, is Judge Lodge found that the defect was extremely slight. The DSM-5 says that the defect has to be at least moderate. Counsel, you're over your time. I think I'm going to cut this off now. We'll give you a minute for rebuttal. Thank you. Thank you. And I'll be quiet next time. I'm going to give Judge O'Scalin plenty of time to weigh in. Thank you. He's no shy flower, anyway. Counsel, for my purposes, at least, could you focus on the last issue, the sentencing issue? Yes, Your Honor. At some point. Yes, Your Honor. May it please the Court, Mike Mitchell for the United States. I'd like to start off by talking about the fact that during the time period that Dr. Byer was distributing this oxycodone, hydrocodone, and Adderall for cash and sometimes money, he was also running a successful and busy medical practice by his own testimony at trial.  I'm not sure I understand. Sorry, cash and sex. Oh, okay. I understand that. Yeah. Sometimes sex, mostly money. But during that time period, Dr. Byer ran a successful medical practice. According to his own testimony, he had between 3,000 and 3,500 patients, according to his testimony at trial. Dr. Byer was also supervising a medical clinic or, sorry, a psychological mental health clinic with a practicing psychologist, as well as a social worker during the same time period. He was also appointed by Idaho courts to evaluate individuals who were alleged to be incapacitated in probate and guardianship proceedings, and those excerpts are provided at the beginning. This last point about how he was evaluating other people's competency, essentially, are you making that point to make the implication that he knew how to fake being incompetent? I was wondering what the point of that third point was. The point of the third point is that Dr. Byer had great professional responsibility. In other words, and this argument that since 1996 or beginning around 1996, Dr. Byer has had longstanding incapacity, that he's been insane since that time, that his capacity has been diminished, that he didn't know the difference between right and wrong for all of those years while distributing all of those drugs, is not consistent with the professional practice of Dr. Byer who had all of these responsibilities, not only in his medical practice, but these tangential responsibilities because he was a doctor. Let me ask you this question, and I want to make sure that I'm not interpolating this in from a case that I had. Didn't he sign blank prescription forms? Did he sign blank prescription forms? I don't think they were blank. They were to the grandmother. Were they filled in already? I thought so. But they were, like, handed out in return for cash or whatever he was doing, right? Yes, Your Honor. Not much examination, if any. I could cite you to the record, but it's replete with witnesses that show that Dr. Byer was selling prescriptions. So he was writing them. He would give individuals prescriptions for a certain number of pills based upon how much money they brought him. So he might give a prescription for 30 oxycodone or 90 hydrocodone or 60, depending on the amount of money that was being paid to Dr. Byer. He was actually writing out this? He was writing. So he would write them sometimes directly, but oftentimes he was working with certain individuals, these adult dancers at the strip club. And these dancers would come to him with lists of names of friends and family. And, again, this is – I could give you the excerpts, but they're in our brief. But that record at trial showed that he was selling all of these women prescriptions for these controlled substances and other people's names that they were bringing him. And they were different controlled substances? Just the three, Adderall, oxycodone, and hydrocodone. Well, that's right, but it wasn't just oxycodone, right? Correct. Did he ever write a prescription at all for ginseng? No, not that I'm aware of. I think the ginseng reference – ginseng wasn't a big part of this trial, actually. Just in one of the videos, he made a reference to the fact that he was involved in ginseng. And I think the defense tried to use that at trial to say that in the video, because they had to explain this video where he was talking about distributing pills, they said, oh, he was distributing ginseng. It really wasn't a big focus of this trial. What happened at this trial was Dr. Byer went into trial with the belief that the jurors would not believe these women because they were adult dancers at this club. And these women came, and they testified, and the jury did believe them. And Dr. Byer testified reasonably and rationally about why jurors shouldn't believe them, why maybe some of his charts were messed up. He tried to rationally explain the evidence. And, in fact, in the defendant's reply brief, they talk about him being psychological – I'm sorry, psychotic and delusional. They say that the record is replete with instances that Dr. Byer believed the prosecution is a scam and a grand conspiracy, but none of that was in Dr. Byer's testimony. And if the court were to read Dr. Byer's testimony, and certainly in our brief, we tried to kind of outline what Dr. Byer did, Dr. Byer tried to rationally rebut and call these women liars and put his reputation up against theirs. And then only after Dr. Byer was convicted did these assertions of insanity and incompetency were they raised. And it almost appears sometimes like there's this effort to almost recreate the trial record that shows a person – and I'm talking about Dr. Byer and his testimony – trying to rationally address – and the court made district findings on this. The court viewed Dr. Byer's testimony as articulate. That's how the court described it, and that's how it appeared at trial. I didn't see it anywhere. Now, maybe I missed it. I certainly wasn't at the trial, but I didn't see it anywhere. Did he ever testify that he was actually prescribing ginseng? I can't recall. I think there may have been a reference to ginseng with respect to that video. Again, Dr. Byer had to try to explain. Well, he had to explain away three different drugs. Yes, Your Honor. And his explanation was messed up charts, and he didn't know what he was doing, and they're lying. Yes. That's correct, Your Honor. But not that all of them wanted ginseng. No, Your Honor. Okay. Your Honor, Judge Ezra, you asked me to address the quantities of drugs. You can buy ginseng over the counter, can't you? I don't know, Your Honor. I believe you probably can, but I don't know. I think I've seen it. Counsel, on the quantity, I have the concern about whether there's corroboration in this record. Why shouldn't we remand this to the judge to take another look to be sure that the quantities were indeed corroborated? He arrived at 192 months, but I'm not quite sure how he got there. Yes, Your Honor. There was actually testimony at the beginning of the sentencing hearing by a special agent, Ed Jacobson, who testified about how the variations, depending on what witnesses the court believed about quantity levels and what they meant in terms of the guidelines. So certainly the court could look at that. But to be sure, the district court ---- But isn't that guesswork, really, at that point? No, Your Honor. The district court looked at the pre-sentence report, looked at these reports of how many drugs were being provided based upon this testimony and reached a conservative quantity. In fact, the original pre-sentence report held that there was an offense level of 34 for a base offense level for the quantity. Dropped it, didn't he? Yes, the district court dropped it to 32. And so ruling actually disregarded evidence from two different witnesses who testified about drug quantities in order to reach what the court deemed as a conservative estimation. But the pharmacy data shows only a tiny fraction of the estimated amounts. There's a huge discrepancy between the estimates and what the pharmacy data showed. I don't know that there's a discrepancy at all, Your Honor, respectfully. And the reason I say that is because it's part of Dr. Byer's scheme. Dr. Byer wasn't selling Fannie Bracamonte and Destiny Blaski and Jordan Newkirk and Stacey Bernstein, these women, he wasn't selling them prescriptions in their names. He was selling them prescriptions in the names of people, other people, and they would bring him large number of names. And then he would write them in those names because pharmacies would be rejecting a prescription from Stacey Bernstein if she acquired 90 pills of oxycodone one day and the next week brought in another prescription for 90 oxycodone either at that pharmacy or somewhere else. And all of these women, their testimony corroborates each other. And what also corroborated the testimony of these women, who said that they were using other names, were the medical charts that we actually introduced into evidence that showed the names of people found in Dr. Byer's files that we obtained pursuant to a search warrant. And we were able to bring some of those people into court. We didn't bring, you know, the entire public into the court and all the names into the court, but we brought selective witnesses who said, I was never at Dr. Byer's clinic, but I knew Destiny Blaski, and I didn't get the prescription that Dr. Byer wrote to me because I'm not his patient, I've never met Dr. Byer, but I knew Destiny Blaski. And then Destiny Blaski would testify at trial, yes, I used my friend's name. So the quantity was based in some part on Bracamonte and Blaski's testimony at trial. That then was used in the sentencing. Is that how the corroboration comes in? Yes, Your Honor, and their testimony, and this is described as well as I could in our brief, was corroborated by numerous other witnesses. And, in fact, sometimes I would just, for sake of summary, because we had a limited number of pages, we would say something like six witnesses corroborated Blaski's statement that Blaski purchased prescription drugs in their names. And the indictment shows this as well. So if the court looks at the indictment, the substantive counts, the substantive counts will identify these women, Blaski, Bernstein, Newkirk, and it will say that they purchased the drug, but then on the side, in the next category within the field of the indictment itself, is the name of the person whose name was used on that prescription. And then we offer those prescriptions. So we know that the type of scenario that the district court used to arrive at its lowest, its conservative drug totals, we know that was happening because we proved it at trial. Well, I show 802 grams between Blaski and Brachiamonti, 219 for Blaski, 583 for Brachiamonti. How much beyond that has been corroborated? I'm sorry. Could the court repeat the question? I'm not sure I'm following. I show from the PSR. Yes, Your Honor. 219 grams for Blaski, 583 grams for Brachiamonti, a total of 802 grams. How much, you know, that's a base amount. Yes. But the sentencing was based on a much higher figure than that. The sentencing was based upon a much higher figure because, again, if we just pulled Destiny Blaski's records or Fannie Brachiamonti's records, there would be only very few prescriptions that were given to them in their name. So the Board of Pharmacy records will not show. No, I understand that, and that's a reasonable response. The real question is how much proof should we expect in the sentencing process when you're trying to get to quantity for purposes of where it fits in the sentencing guidelines? In other words, I can see the 32, but I can't see the 36 so far. Yes, and, Your Honor, the district court reduced it from 34 to 32, just to be clear about what the record shows. But the district court is obligated, in terms of its standard, to reach a reasonable estimation, and I believe the standard is always the same as any sentencing issue, which is preponderance of the evidence. You know, I think Judge O'Scanlan, you correct me, Judge, if I'm wrong, was asking you what evidence was actually adduced at trial, at the sentencing, to establish the difference between what these two women actually got in their own name and the additional quantity that was found by the district judge to be appropriate, inclusible in the calculation, includable. I understand now, Your Honor. The testimony of witnesses at trial who corroborated that Blaski and Bernstein and Fannie Bracamonte were getting prescriptions in others' names. That's fine, but did somebody ever put in how many of those there were and what the quantities were? Or was it just... The district court went on the estimation of these women and their testimony at trial about how many prescriptions they received from Dr. Byer and other people's names. And largely it was based upon their addiction. So, for instance, Destiny Blaski testified at trial about using large numbers of oxycodone just to basically live because she was so addicted to those pills. And she received all of her prescriptions from Dr. Byer. I thought there was testimony from Bracamonte that said she met with Byer two to three times a week to get prescriptions for others. Blaski saying it started out as a couple of prescriptions a week and it went up to five a day. I mean, that's the testimony that you're relying on, isn't it? Yes, Your Honor. And is the standard even that every bit needs to be corroborated, or is it that you just need to make a reasonable estimate anyway? As I said earlier, Your Honor, the requirement is that the court reach a reasonable estimation upon drug quantities. And here, again, the district court tried to be as conservative as possible and lowered the base offense level for the drugs by two levels. What's your best case on that? What's your best case on that point? In other words, a reasonable estimate is enough. If I could have just a second, Your Honor. It looks like Forrester. Okay. That's fine. Thank you. Thank you, Your Honor. And I'm out of time. Thank you, counsel. We'll give you a minute for rebuttal. On the sentencing issue, it's pretty well laid out in the brief what Dr. Byer's position is, but there are no other Board of Pharmacy records from Idaho or Washington that corroborate Ms. Bracamonte's testimony or Ms. Blaski's testimony that they were getting three to five prescriptions a week because the Board of Pharmacy records would show that during the period of time that the government said that they were involved in this activity with Dr. Byer. They were getting it. They were getting it in other people's names, according to the testimony. And it shows that on the pharmacy records. If you compare it, the government's exhibits will show who the prescription was made out to and who the prescription was given to by Dr. Byer. So it's all in the pharmacy records. Those count. So it's actually all laid out in the Board of Pharmacy records, who received the prescription and who gave the prescription to or who he gave the prescription to. It's all recorded in the pharmacy records. So there's nothing outside of the pharmacy records that corroborates any of the trial testimony in relation to the prescriptions that were actually introduced at trial. And there's no other. Are you saying that the pharmacy, Board of Pharmacy records are records by doctor or by patient? It's by patient and by doctor. So the counts that are charged in the indictment superseding fourth indictment, I think, it lays out in each count the initials of the person who actually got the prescription from Dr. Byer and who the prescription was made to. Those will correlate to the Board of Pharmacy records that were introduced at trial. But if the witnesses testified that they received five a day or ten a week and they were giving these prescriptions out, is there any reason that we think we have pharmacy records to match up to all of that? Or can the judge just sort of count the prescriptions and figure that it must be this quantity? If those prescriptions were filled, they will be in the Board of Pharmacy records. But was every name of everyone that they were giving the prescriptions to part of this record that they could trace back to? Yes. Yes. And those were the exhibits that were admitted at trial. So the testimony that they were receiving these pills over and above and beyond what the Board of Pharmacy records showed just don't exist because there's no evidence that Dr. Byer had an independent source of pain pills. There's just no record. Can you point us to where it's clear that every person that would have gotten a prescription from Blaski was in a pharmacy record that was admitted at trial? I'm not standing here right now, I can't. In the court, that's what the evidence shows. Because they were admitted at trial, they were admitted as exhibits at trial, and the exhibits are before this court in a non-scannable exhibit. And those exhibits correlate with each count of conviction. So the person that came up to the stand, there is a Board of Pharmacy record that will correlate with that. For those folks who said, I've never met Mr. or Dr. Byer in my life, but I gave this prescription to Destiny Blaski, the Board of Pharmacy record that was admitted at trial will show that transaction. I don't think there's any record beyond. In other words, the Board of Pharmacy records would show every prescription that Dr. Byer made during this appropriate time frame. In relation to the trial and the trial counts that were alleged. So the additional... So there's no other source. I mean, you wouldn't need another source. Is that what you're saying? Well, there's testimony that he was given pills out, like 500,000 pills. It was Destiny Blaski's sort of general that she received 500,000 pills in a period of like 8 or 11 months. And there's just no... Now, the PSI didn't find that. The PSI tailored it down a little bit, but it still went over and above the corroboration in the pharmacy records. So this is unusual, but Judge Ezra is suggesting that we let the government have a minute or two to respond to this, and so we let you go way over your time, and it seems like this is an issue we need to sort out. I have no problem with that. Is there any other issues that came up? I think this is the only issue we are hoping to explore at this point. So let's give the government two minutes to respond to this. Thank you, Your Honor. The government didn't have all of the names of the individuals who... Yeah, but the issue is whether or not there are records of the actual prescriptions that were filled with Dr. Byer's name on it. And if the rules of the pharmacy records are, and this is apparently statewide, that every prescription issued by a doctor is recorded, then there is a problem here. In other words, you can't go by John Doe's. If John Doe received a prescription and got the drugs, the druggist would have had recorded that that drug was prescribed by Dr. Byer. And as long as Dr. Byer's name is in the record and it purports to be all of the prescriptions filled, then there is an issue here. We could have pulled all of the pharmacy records probably for Dr. Byer. We didn't do that. But all of the controlled substance prescriptions that he gave over the period of the conspiracy and tried to attribute all of those to him. Instead, we knew that these women, whose testimony was corroborated by others, because almost all of the witnesses, there were probably seven or eight... Yeah, but we're only focusing at the moment on your relying on the pharmacy records. And to the extent you are, I think there's, at least I have a problem. I'm not convinced. No. So let me put it this way. There were certain indictments. We were trying to prove specific substantive counts in the indictment. And so we obtained Board of Pharmacy records for those transactions and offered those in trial. And they're in the government's exhibits over here. But beyond that, beyond some of the substantive counts that were charged, Destiny Blaski or Fannie Bracamonte, at trial, we only proved that this happened, even though they said it happened all the time. We only proved eight or nine of those as examples. Okay. So let me ask you this. Yes. To get right to the heart of it, I think. What you're saying is that you didn't introduce into evidence all the Board of Pharmacy records for the relevant period of time for this doctor. You only introduced the Board of Pharmacy records that related to the people who testified with respect to the specifics of what you were attempting to prove. Yes, Your Honor, because those were the relevant records to prove substantive counts. And that's what you credit as the difference between what the pharmacy records would indicate and what you are suggesting Judge Lodge correctly found. Yes, Your Honor. And oftentimes in trials, in criminal trials, involving non-doctors, you have witnesses who will testify credibly about, I received so much methamphetamine, you know, maybe a pound of methamphetamine every two weeks from a defendant. And as long as that is credible information provided to the district court, defendants frequently have those drug amounts included in the PSR. And here it is very clear from this record that we introduced a limited number of pharmacy records to prove a limited number of substantive counts for a variety of reasons, but one of which would include, you know, how many witnesses do we want to prove that the doctor committed this crime? How many witnesses, how many counts against Dr. Byer do we want to bring? At sentencing, though, you are entitled to rely on relevant conduct, even if it wasn't proven at trial, as long as it's relevant conduct, right? Yes, Your Honor. That's a big controversial issue, but that's the law. So you could have obtained these additional records from the Board of Pharmacy and introduced them, but instead, and I'm not saying this is wrong, I think this is something the panel is going to have to decide, but instead what you did is you relied on what you had, the testimony of these witnesses to then extrapolate what you believe is reasonably to the quantity that was ultimately found. Am I correct here? You're correct. And for sure, if we only relied upon Board of Pharmacy records, then we are going to miss a great deal of relevant conduct here, because these women and the state that they were in and the level of addiction that they were in, as well as, and all of the, again, all of these witnesses corroborate themselves, as we say in our brief, everybody agrees that Dr. Byer was selling prescriptions to all of these women in a variety of names. We're going to miss all of that, unless they can recall every single person  that they used over all of those years to acquire prescriptions. And if we grabbed, in all fairness to the defendant, if we grabbed all of the prescriptions that Dr. Byer ever wrote for Adderall or hydrocodone or oxycodone and didn't limit it just to the recollection of these witnesses, you have the opposite problem, and that is you're punishing Dr. Byer who is a practicing doctor for giving prescriptions, and we would presume that some of his prescriptions for those drugs were legitimate. So the Board of Pharmacy Records really can't tell whether or not something is legitimate or illegitimate, but we went off the corroborated recollection of these witnesses about how many drugs that they used, and that's very typical in drug cases, including this one. Thank you. Thank you, both sides, for the helpful arguments. The case is submitted, and we are adjourned for the day. All rise. This court for this session is adjourned.
judges: Fletcher, Christen, Silver